

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00213-CR
### NO. 02-14-00214-CR
### NO. 02-14-00215-CR

JOSEPH ALAN NEELEY                                                 APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY
TRIAL COURT NOS. 1338837D, 1338838D, 1338699D

----------

## MEMORANDUM OPINION[1]

----------

Appellant Joseph Alan Neeley appeals his sentences for aggravated assault with a deadly weapon, burglary of a habitation, and possession of less

---

[1]*See* Tex. R. App. P. 47.4.

than a gram of methamphetamine.[2]  In his only point, he argues that the sentences are grossly disproportionate to the facts of his offenses and are therefore unconstitutional.  We affirm.

**Background Facts**

One Saturday in the summer of 2013, after eating lunch with her mother and her sister, high school student D.L. (Danielle)[3] was driving on a one-way access road to a highway.  Appellant, driving the wrong way on the access road, crashed with Danielle's car.  V.L. (Vanessa), Danielle's mother, had been driving behind her on the access road and ran to her after the accident occurred.  Vanessa noticed that one of Danielle's feet had been displaced and that Danielle was screaming; Vanessa called 9-1-1.  Appellant walked toward Danielle's car and looked at her before running away.  An ambulance took Danielle to a hospital, where she received treatment for a broken right ankle.

After arriving at the scene, a police officer found that appellant's car did not have a license plate attached to its front and back ends.  But the car contained a passport and a birth certificate bearing appellant's name.  It also contained pipes used for smoking methamphetamine.

---

[2]Appellant does not ask us to reverse his convictions; he requests only that we "reverse his sentences . . . and remand for a new sentencing hearing."

[3]To protect the identity of persons associated with this appeal, we use aliases.  *See* Tex. R. App. P. 9.10(a)(3), (b); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

Appellant ran across a grassy field and eventually entered a residential neighborhood. A witness of the accident followed him in a car and called the police. When appellant arrived at the house of Shahram Masoumi, who was not there at the time, he broke through and damaged the back fence and back door, broke a satellite, stayed inside the house for several minutes, and left.

Appellant then jumped over a fence and entered another house, where fifteen-year-old D.S. (Dylan) and A.S. (Amy), Dylan's three-year-old sister, were present. Upon entering, appellant told Dylan that he had crashed his car and that he wanted to "lay low for a while." Dylan heard sirens and discerned that the police were looking for appellant.

Appellant remained in Dylan's house for approximately thirty minutes. While there, he stated that he would not harm Dylan as long as Dylan cooperated with his requests. Dylan was scared for his and Amy's safety and believed that they could not leave. Appellant drank some water, washed his face, and lay on a bed to catch his breath. He then told Dylan to go outside and to "ward off the police that were around the area" while appellant remained in the house with Amy. After crossing his front yard, Dylan talked to a police officer. To "play it smart," Dylan did not tell the officer about appellant's presence in the house, and

Dylan returned to the house. At some point, appellant told Dylan that he would slit Dylan's throat if Dylan did not do what appellant asked of him.[4]

After appellant stole a shirt and a pair of shoes and put them on, Dylan told appellant that his parents were likely on their way home. Appellant eventually told Dylan to take off his shirt and his glasses; he planned to create a diversion by having himself and Dylan run out of the house in opposite directions. Attempting to ensure his and Amy's safety, Dylan took off his shirt and glasses. But as Dylan opened the door to start running, he saw his parents walking toward the house. Dylan began to tell his father what had happened in the last half hour, and his father ran into the house. Appellant escaped through a window.

The police eventually found appellant in that neighborhood. An officer told appellant to show his hands and to get on the ground, and appellant repeatedly asked the officer to shoot him. That officer could not restrain appellant on her own, but with the use of two Tasers and other physical force, the police eventually detained appellant, who was flailing, screaming, sweating, and appeared to be intoxicated. During the struggle that resulted in appellant's detainment, two police officers were injured. In appellant's possession, the

---

[4]Dylan testified, "I [felt] like at any moment . . . the whole situation could have just turned the opposite direction, so I tried to keep it as professional and calm as I could."

4

police found a wallet that contained marijuana, Xanax, and methamphetamine; two screwdrivers; a razor blade;[5] and a cell phone.

After appellant's arrest, Arlington police officer Phillip Hill spoke with Dylan, who was nervous and "visibly shaken up." Officer Hill found appellant's discarded clothing inside Dylan's house. Dylan identified appellant as the man who had entered his house and had threatened him. Appellant received medical treatment at a hospital, where blood and urine test results established the presence of alcohol, cannabinoids (from using marijuana), amphetamines, and benzodiazepines (a class of drugs that includes Xanax) in his body.[6]

Through separate indictments, appellant was charged with burglary (by entering a habitation and committing or intending to commit kidnapping), aggravated assault with a deadly weapon (based on the crash), and possessing less than a gram of methamphetamine. In each case, he received appointed counsel; filed several pretrial motions, including an application for placement on community supervision "for whatever punishment may be assessed"; and chose the jury to assess his punishment if he was convicted.

At a combined trial on the charges, appellant pled guilty to possessing methamphetamine and to aggravated assault, but he pled not guilty to burglary.

---

[5]During the punishment phase of the trial, appellant testified that he carried the razor blade to cut lines of methamphetamine.

[6]A toxicologist testified that when these substances are taken together, their negative effects may be multiplied. Specifically, he explained that "[a]lcohol increases the danger or the negative side effects of just about every other drug."

After hearing evidence and arguments and briefly deliberating, the jury found him guilty of burglary. The jury heard evidence concerning appellant's punishment[7] and assessed twenty-five years' confinement for burglary, twenty years' confinement for aggravated assault, and two years' confinement for possessing methamphetamine. The jury did not recommend appellant's placement on community supervision for any of the offenses. The trial court sentenced him in accordance with the jury's verdicts and ordered the sentences to run concurrently.

Appellant filed a motion for new trial in which he argued that his sentences were "grossly disproportionate to the facts of the case[s] and reflected no consideration of mitigative evidence[,] contravening the [s]tate and [f]ederal [c]onstitutional prohibition[s] against cruel and unusual punishment." The trial court did not expressly rule on the motion, and it was therefore overruled by operation of law.[8] Appellant brought these appeals.

**Allegedly Unconstitutional Punishment**

In his sole point, appellant contends that his sentences are unconstitutional because they are grossly disproportionate to the facts of the offenses and are therefore cruel and unusual.[9] *See* U.S. Const. amend. VIII; Tex. Const. art. I,

---

[7]We will summarize this evidence below.

[8]*See* Tex. R. App. P. 21.8(a), (c).

[9]In the trial court and on appeal, appellant has raised federal and state constitutional complaints, but he has not analyzed them separately. We will

6

§ 13. He raised this argument for the first time in his motion for new trial. We review a trial court's denial of a motion for new trial for an abuse of discretion. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). A trial court abuses its discretion by denying a motion for new trial when no reasonable view of the record could support its ruling. *Id.*

The factfinder's discretion to impose any punishment within a prescribed statutory range is essentially "unfettered." *Ex parte Chavez*, 213 S.W.3d 320, 323 (Tex. Crim. App. 2006). Subject only to an "exceedingly rare" and "somewhat amorphous" gross-disproportionality review required by the Eighth Amendment, a punishment that falls within the legislatively-prescribed range and that is based upon the factfinder's informed normative judgment is unassailable on appeal. *Id.* at 323–24; *Adetomiwa v. State*, 421 S.W.3d 922, 928 (Tex. App.—Fort Worth 2014, no pet.); *see Lawrence v. State*, 420 S.W.3d 329, 333 (Tex. App.—Fort Worth 2014, pet. ref'd) ("Generally, punishment assessed within the permitted statutory range is not subject to a challenge for excessiveness."); *Sample v. State*, 405 S.W.3d 295, 304 (Tex. App.—Fort Worth 2013, pet. ref'd) (stating the same).

When deciding whether an exceptional sentence might be grossly disproportionate to an offense committed, we compare the gravity of the offense

---

consider these complaints together. *See Cantu v. State*, 939 S.W.2d 627, 645 (Tex. Crim. App.) (declining to interpret the language of our state constitution's prohibition of inflicting cruel or unusual punishment as more expansive than the federal constitution's similar provision), *cert. denied*, 522 U.S. 994 (1997).

committed with the severity of the sentence.[10] *Lawrence*, 420 S.W.3d at 333; *see also Alvarez v. State*, 63 S.W.3d 578, 581 (Tex. App.—Fort Worth 2001, no pet.) ("We judge the gravity of the offense in light of the harm caused or threatened to the victim or society and the culpability of the offender."). We also consider the likely impact of the defendant's criminal history on the factfinder's punishment decision. *Sample*, 405 S.W.3d at 304–05 (recognizing that a repeat offender's sentence is not based "merely on that person's most recent offense but also on the propensities he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes"); *Culton v. State*, 95 S.W.3d 401, 403–04 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd).

By the effects of his guilty pleas and after considering the evidence presented at trial, the jury convicted appellant, who was thirty-three years old at the time of the trial, of three felony offenses: possession of less than a gram of methamphetamine, which (as a state jail felony) carries a punishment range of up to two years' confinement; aggravated assault with a deadly weapon, which (as a second-degree felony) carries a punishment range of up to twenty years'

---

[10]If we determine that a sentence is grossly disproportionate to an offense, we may also consider the sentences imposed on other criminals in the same jurisdiction and the sentences imposed for the commission of the same crime in other jurisdictions. *See Hammer v. State*, No. 02-13-00480-CR, 2015 WL 1407385, at *3 (Tex. App.—Fort Worth Mar. 26, 2015, no pet.) (citing *Moore v. State*, 54 S.W.3d 529, 541 (Tex. App.—Fort Worth 2001, pet. ref'd)); *Pollard v. State*, Nos. 02-11-00496-CR, 02-11-00497-CR, 02-11-00498-CR, 02-11-00499-CR, 02-11-00500-CR, 2012 WL 5447955, at *1 (Tex. App.—Fort Worth Nov. 8, 2012, no pet.) (mem. op., not designated for publication). Appellant did not present any such evidence.

confinement; and burglary of a habitation, which, under the circumstances of this case (as a first-degree felony) carries a punishment range of confinement for up to ninety-nine years or life. *See* Tex. Penal Code Ann. §§ 12.32(a), .33(a), 22.02(a)(2), (b), 30.02(a)(1), (d) (West 2011), § 12.35(a) (West Supp. 2014); Tex. Health & Safety Code Ann. § 481.115(b) (West 2010). The jury assessed the maximum punishment for possession of methamphetamine and for aggravated assault (two and twenty years' confinement, respectively), but it assessed only one quarter of the maximum confinement—twenty-five years—for burglary.[11]

The jury could have rationally determined that appellant's crimes were sufficiently grave to justify these sentences. The evidence shows that appellant's possession and use of methamphetamine contributed to the aggravated assault and that as a result of this assault, Danielle suffered an ankle injury[12] that caused significant pain and will affect her for the rest of her life. In the punishment phase, Danielle testified that when the crash occurred, she "looked down, and [her] foot was twisted in a way that . . . wasn't supposed to be twisted." She stated that appellant "ran instead of helping [her] while [she] was crying and . . . screaming." After the heavy swelling in Danielle's ankle subsided, she had two surgeries. She also required physical therapy for seven or eight months.

---

[11]Appellant concedes that his sentences are "within the applicable statutory penalty ranges."

[12]From the wreck, Danielle also suffered from a rash on her chest and a swollen lip.

Danielle's foot will never be normal again; for example, she cannot kick a ball, run, or walk up stairs normally. Danielle has nightmares about the crash. According to Vanessa, at the time of the trial, which occurred nine months after the wreck, Danielle's ankle was still not healed; she was still limping, and her injured ankle looked different than her other ankle. Vanessa explained, "Danielle's not the same person she was, not physically, not emotionally. She'll never be the same person. We'll never be the same family."

The evidence also shows that during his crime spree, appellant broke into multiple homes (damaging and stealing property in the process) and confined and threatened Dylan and Amy, who were both children, for approximately half an hour. Particularly, appellant threatened to slit Dylan's throat if Dylan did not do what appellant commanded. Later, appellant resisted police officers' attempts to detain him, causing minor injuries to two of them.

The jury also heard about appellant's criminal activity that was unrelated to the events supporting these three convictions. On the day before his arrest for the events leading to his convictions in these cases, appellant was spotted outside of an Addison apartment on an early morning, was suspected of committing burglary of a habitation,[13] and was arrested for evading arrest and possessing methamphetamine. On that occasion, after the police found him and

---

[13]A caller to the police reported seeing a man jump over a balcony into a patio area and then jumping back over the balcony with a "cylindrical object in his hand."

10

caught up to him while he was running, he engaged in a physical struggle but was finally subdued with the assistance of three officers, handcuffs, and leg restraints. Appellant, who was intoxicated, possessed a small baggy containing methamphetamine and one Xanax pill.

Appellant also has two older convictions for driving while intoxicated (DWI). The record indicates that concerning one of those DWIs, appellant was stopped and arrested after driving 113 miles per hour. With regard to appellant's first DWI conviction, he was placed on community supervision but violated the terms of it by committing another DWI. Appellant committed the three offenses at issue only a year after being discharged from community supervision for his second DWI.

Appellant presented evidence that the jury could have considered (and perhaps did consider)[14] as mitigating. Appellant's mother, V.P. (Violet), testified that when appellant was very young, his father, A.N. (Aaron), was physically abusive and used alcohol and drugs to the point of intoxication. According to Violet, Aaron would choke her in front of appellant, prompting appellant to ask Aaron not to kill Violet. Violet testified that Aaron was strict and mean to appellant and that when appellant was three years old, Aaron took him out of the

_____

[14]Appellant argues that mitigating evidence, including issues related to his addictions to drugs and alcohol, was not "fairly considered by the jury as reflected by the grossly disproportionate maximum sentence assessed." But the jury could have considered this evidence when assessing appellant's confinement for burglary at twenty-five years, which is on the lower end of the first-degree felony punishment range.

11

state and separated from Violet. Also, Violet admitted that before Aaron left her, while she still had custody of appellant, she was not a good mother and made "very bad decisions."

Appellant returned to Texas and began living with Violet again when he was eleven years old. He told Violet at that time that he had been living in shelters, that he had been expected to "take care of" his younger brother, and that Aaron had been abusive to various women after leaving Texas.

Concerning appellant's development after he began living with her again, Violet testified,

> Joseph has always been a great kid. He's always been good to me. He's always been respectful. He's always been an achiever. . . .
>
> I was a waitress for many years, so I taught him how to be a server. From there, he got a job at a five-star restaurant, worked his way up in the company to a manager. From there, he met someone who gave him an opportunity at Bank of America. From that, with hardly no education, he ran with it and learned on his own through the company. He eventually built himself up to be a mortgage broker. Bank of America sent him to college, and he got married, he had a family.

Violet acknowledged, however, that appellant has a problem with abusing alcohol and drugs that first surfaced when he began getting laid off from work. She testified that appellant began using methamphetamine when he was a server at a restaurant so that he could work at a second job without becoming tired.

Appellant has been married twice. He has a total of three children, including two through his current wife. Upon his arrest for these charges, appellant stayed in jail for six months before he was released on bond.

12

According to Violet, since appellant's release, he got a job, paid some child support to his first wife, and sought treatment for his substance abuse (including attending Alcoholics Anonymous meetings). Violet recognized, however, that appellant had previously sought counseling for abusing alcohol before committing these offenses.

Violet testified that appellant has a "heart of gold," is a great father, and is "very protective"; she explained that appellant does not show these qualities when he is using drugs. She asked the jury to recommend appellant's placement on community supervision because she believed "in [her] heart and [her] soul that putting [appellant] in prison [would] not . . . do any good." She testified, "[Appellant has] three children that depend on him [and] that idolize him, and . . . it's going to deeply affect the rest of their lives if he goes to prison."

William Ritchie, who works with troubled youth, testified that he has known appellant since 2000, when they were both waiters at a restaurant. Ritchie stated that appellant is an "incredible" and "valiant" father who has worked hard to provide for his family. Ritchie opined that appellant had the drive and desire to succeed on probation, and Ritchie stated that he could help hold appellant accountable for the terms of probation if the jury recommended it. According to Ritchie, appellant's actions on the date of these offenses were "absolutely out of character." But Ritchie recognized that appellant's prior placement on probation for his DWI offenses had not abated future criminal activity. He also conceded

13

that appellant had not called him for support before committing several offenses over the course of two days in August 2013.

Raymond Arendondo, who supervised appellant at a car dealership where appellant was working at the time of trial, testified that he met appellant at a church retreat and that appellant had attempted to be active in church since then. Arendondo stated that at work, appellant was punctual and dependable. He testified that appellant's work schedule would allow him to meet requirements of probation and attend Alcoholics Anonymous meetings.

Mary Jo Gutierrez, a probation officer, told the jury about many potential conditions of probation, including committing no further offenses, reporting regularly to a probation officer, not using drugs or alcohol, completing community service, and paying a victim's restitution. She also spoke about drug treatment programs—including long-term inpatient treatment—that could be available to appellant if the jury recommended probation for him. Gutierrez opined, however, that a defendant is not a good candidate for probation when in relation to a different offense in the past, the defendant has violated probation by committing a new offense.

In his punishment-phase testimony, appellant apologized to Dylan and Amy's family and Danielle and Vanessa's family for the harm he had caused them. He stated that because of his drug use at the time, he did not remember anything about getting arrested or being confined for the incidents in Addison or in Arlington over the course of two days in August 2013. He explained that near

14

that time, he was taking several prescribed medications to help reduce anxiety and to sleep and that he mixed those medications with drinking alcohol and using methamphetamine.

Appellant explained that his "dad was a truck driver" who "took [him] from [his] mother." He stated that he constantly moved to different cities and never went to the same school for consecutive years. He explained that during that time, his father used methamphetamine and was physically abusive to him and his brother.

Appellant admitted that he was addicted to alcohol and illegal drugs, and he testified that he could benefit from treatment programs.[15] He explained that upon his release from six months of pretrial confinement for these three offenses, he began attending Alcoholics Anonymous or a similar program for drug abusers four times per week and had not used alcohol or any illegal drugs.[16] Appellant also testified that he attempted to go to inpatient drug treatment but that he could not afford it. He explained that he would be willing to comply with all conditions of probation, including completing drug treatment and 320 hours of community service and paying restitution to Danielle. When his counsel asked why he deserved probation after threatening to slit Dylan's throat, appellant testified,

---

[15]Appellant began using marijuana when he was eleven years old and later used methamphetamine and cocaine.

[16]Appellant testified that he had been drug tested three times since his release and that he had passed each test.

15

I'm not saying I deserve probation, not at all. I'm just begging for the mercy of the jury and the Judge today. That was not in my character. And I do have a problem, and I just don't want to see anybody else get hurt because of me. I don't want my children to grow up without a father.

Appellant's wife of nine years, K.N. (Kim), testified that a couple of months before the accident, appellant's behavior began to change: he became very nervous, looked different, did not sleep, and cried a lot. According to Kim, after his most recent release from confinement, while he was awaiting trial of these charges, appellant found God and thrived in his relationship with her and their children. She testified that appellant needed inpatient drug treatment and that she could survive financially while he received it.[17] While Kim admitted that there was "no excuse" for appellant's crimes, she asked the jury to place appellant on probation; she pled for "compassion and . . . forgiveness for a . . . beautiful person."

But when the State asked Danielle whether appellant should be placed on probation, she said no and explained,

> [W]hat he did to me, it may be minor in some people's eyes because it's just an ankle, but I don't think [appellant has] learned from his [DWIs] or from any of his past accidents. I don't think probation is going to help because he's already been on probation, and I don't think he should be free. I don't think he should get out of jail because this time it was just my ankle; next time, what is it going to be? Another child dead? Another child with a broken ankle? Another adult? Someone dead eventually? And I don't think he should be free to teach his kids that it's okay to break someone's

---

[17]She also testified that she and the children could survive financially if appellant was confined.

16

ankle and to ruin someone's life and just get off on probation. I don't want to see him free. I want to see him in prison. I want to see him in jail. And I don't think he's going to learn anything if he has probation because he hasn't learned from any of his past mistakes.

Considering all of these facts and the other evidence presented to the jury,[18] we cannot conclude that the jury acted unreasonably or arbitrarily when exercising its near-unfettered discretion to impose the sentences at issue. *See Chavez*, 213 S.W.3d at 323. Even while recognizing the mitigating facts described above, the jury could have rationally assessed lengthy terms of confinement based, in part, on the harm or threatened harm to the victims of appellant's crimes at issue and on his failure to abate criminal conduct after receiving leniency, in the form of community supervision, for prior offenses.[19] *See Sample*, 405 S.W.3d at 304–05 (considering a defendant's criminal history in determining whether his sentence was constitutionally excessive); *Alvarez*, 63 S.W.3d at 581 (considering the harm caused and threatened to the victim); *see also Stuer v. State*, No. 02-14-00243-CR, 2015 WL 1407750, at *3–4 (Tex. App.—Fort Worth Mar. 26, 2015, no pet.) (mem. op., not designated for publication) (stating that because a defendant had received leniency with regard

---

[18]We note that we are reviewing the evidence based on a cold record, while the jury saw the witnesses, including appellant, and could judge their credibility and sincerity. *See Franklin v. State*, 193 S.W.3d 616, 620 (Tex. App.—Fort Worth 2006, no pet.) (explaining that the jury is free to accept or reject any or all of the evidence of either party).

[19]We reject appellant's argument that the evidence showed only "a single day of escalating poor choices."

to past crimes by being placed on community supervision but had violated terms of the community supervision, the jury "could have . . . reasonably rejected [the defendant's] claim" that she would be able to refrain from committing more crimes).  Likewise, we conclude that the trial court did not abuse its discretion by denying (by operation of law) appellant's motion for new trial based on the alleged excessiveness of his sentences.  *Colyer*, 428 S.W.3d at 122.

Appellant relies on the court of criminal appeals's decision in *Jackson v. State*, 680 S.W.2d 809 (Tex. Crim. App. 1984).  There, the court held that a trial judge had abused his discretion in setting punishment when the judge had not presided over the trial on the appellant's guilt and had not allowed either party to offer punishment-related evidence.  *Id.* at 810–14.  Here, the jury received substantial evidence in the guilt-innocence and punishment phases of appellant's trial; appellant's reliance on *Jackson* is therefore misplaced.  *See id.*

For all of these reasons, we conclude that appellant's sentences are not unconstitutionally excessive and that the trial court did not abuse its discretion by denying his motion for new trial.  We overrule his sole point.

## Conclusion

Having overruled appellant's only point, we affirm the trial court's judgments.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER, J.; and CHARLES BLEIL (Senior Justice, Retired, Sitting by Assignment).

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: July 9, 2015